Filed 1/23/25  P. v. Randall CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>ANTHONY MARTEZZ RANDALL,<br><br>  Defendant and Appellant. | H050165<br>(Monterey County<br> Super. Ct. No. 21CR002989) |

In 2022, a jury convicted defendant Anthony Martezz Randall of the first degree murder of Lloyd Joseph Perkins in 1995.  The trial court sentenced Randall to a total term of 59 years to life in prison.

On appeal, Randall argues that the trial court erred in admitting evidence of a prior incident to prove motive and intent under Evidence Code section 1101, subdivision (b) and, alternatively, that the trial court should have excluded the evidence as more prejudicial than probative under Evidence Code section 352.

We disagree and will affirm the judgment.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Procedure

On May 3, 2022, the Monterey County District Attorney filed an amended information charging Randall with one count of first degree felony murder (Pen. Code,

§ 187, subd. (a); count 1),[1] with a special allegation that Randall personally used a firearm in committing the murder (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a)). The information further alleged that Randall had both a prior strike conviction (§§ 667, subd. (d), 1170.12, subd. (b)) and a prior serious felony conviction (§ 667, subd. (a)(1)).

After being instructed on first degree felony murder, with robbery as the underlying felony, the jury convicted Randall of that offense and found true the personal use of a firearm enhancement allegation. In a bifurcated proceeding, the trial court found true the allegations that Randall had a prior strike conviction and a prior serious felony conviction.

After denying his *Romero*[2] motion, the trial court sentenced Randall to a total term of 59 years to life in prison, consisting of an indeterminate term of 50 years to life on count 1 (25 years to life doubled due to the strike prior conviction), plus determinate consecutive terms of four years on the personal use of a firearm enhancement (§ 12022.5, subd. (a)) and five years on the prior serious felony conviction (§ 667, subd. (a)(1)).

Randall timely appealed.

**B. Facts**

**1. Prosecution case**

Late in the evening on September 21, 1995, Perkins and T.M.[3] were walking to Perkins's car on a darkened walkway when someone grabbed him. As T.M. ran back to the apartment that she and Perkins had just exited, she heard gunshots. Perkins was fatally shot in the head and chest. Randall was identified as a suspect during the first investigation, but he was not initially charged with Perkins's murder. As discussed in

---

[1] Unspecified statutory references are to the Penal Code.

[2] *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497.

[3] We refer to the witnesses in the proceedings by their initials to protect their personal privacy interests pursuant to California Rules of Court, rule 8.90(b)(10).

more detail below, over the course of nearly three decades and several rounds of investigation, additional evidence was obtained which led to the subject charges.

### a. Events leading up to and including the 1995 murder

#### i. T.M.'s testimony[4]

T.M. testified that she and Perkins lived together, and they had a son, who was born in 1994. Their relationship continued "until he went to the penitentiary." While Perkins was incarcerated, T.M. had an "[o]n and off" relationship with Randall.

Perkins was released from prison about a month before he was killed. At no time during T.M.'s relationship with Randall did he express any opinion about Perkins, good or bad. T.M. had ended her relationship with Randall by the time Perkins was released. She testified that Randall was sometimes violent with her. T.M. reported some, but not all, of these incidents to the police.

About a week before Perkins was killed, T.M. was at her aunt's house, braiding her cousin S.M.'s hair. Perkins was next to her on the bed when someone knocked on the door. Randall came in and "jumped on [Perkins]." Randall was pointing a gun at Perkins, saying "Give me money." Perkins had just given money to T.M. so he told Randall he did not have any money. Randall got off of Perkins, but then attacked T.M., who testified that she "thought he was choking [her], but he was really trying to poke out [her] eye." T.M. told S.M. to leave and call the police. Randall left the house.

On the night Perkins was killed, T.M. was at her friend K.S.'s apartment in Seaside with Perkins and another person. They were "[p]laying dominos, smoking weed, and drinking beer." Randall called and T.M. spoke to him briefly. T.M. was confused as she did not know how Randall had K.S.'s number and did not know why he had called.

_____

[4] T.M. died a few months before the trial so her preliminary examination testimony was read into the record.

T.M. later told police that Randall hung up on her when she told him that she would not "fuck with [him] no more."

T.M. left K.S.'s apartment with Perkins who was going to give her a ride home. As they walked through a doorway to the parking area, T.M. saw Perkins get "snatched" to the side but she did not see who grabbed him. T.M. turned and ran back to K.S.'s apartment and called 911. T.M. heard two popping noises, which she first thought were balloons but then realized were gunshots.

T.M. started dating Randall again at some point after Perkins was killed and their relationship was on and off over the next six years as Randall was in and out of jail.

### ii. S.M's testimony

S.M. testified that, in 1995, she was 14 years old[5] and living in Marina with her mother. She would often go to her aunt's house and spend time with her cousin, T.M. In 1995, T.M. was dating Perkins.

One afternoon, S.M. was at her aunt's house and T.M. was braiding her hair. T.M. sat on the bed with S.M. on the floor between her legs. Perkins walked quickly into the room, carrying a brown paper bag with cash sticking out the top and looking behind him. Seconds later, Randall followed Perkins into the room.

S.M. testified that Randall told Perkins to give him the bag of cash, but Perkins refused. Randall suddenly pulled out a gun and pointed it at Perkins who was backed into a corner. S.M. described the gun as "[s]ilver chrome with [a] cream handle." Randall again told Perkins to give him the bag, but Perkins replied that Randall would "have to kill [him]" to get the bag.

T.M. started screaming at Randall to put the gun away and get out. Randall told T.M. to shut up and slapped her with the gun, before beating her with his fists and

---

[5] S.M. was 41 years old at the time of trial.

"snatch[ing] the braids out of her hair." As Randall was beating T.M., he was saying things like, "You left me for this n[---]a?[6] Dumb ass bitch." T.M.'s scalp was bleeding and she told S.M. to run. S.M. ran out of the house and down to a neighbor's home on the corner. S.M. did not know if anyone called the police, and her mother came to pick her up from the neighbor's home.

S.M. later learned that Perkins was killed three days after this incident. At the time, police did not contact her about Randall threatening Perkins with a gun or Randall beating T.M. S.M. did not tell police about this incident until 2022 when she was subpoenaed for court.

### iii. K.S.'s testimony

K.S. testified that, on the night of the murder, Perkins was at her apartment with T.M. and was "restless," "pacing back and forth." Randall called and asked her who was at her apartment. K.S. told her that T.M. and her roommate were there, but when she got to Perkins, she saw Perkins make a "slashing motion" across his throat. K.S. was not certain whether she actually said Perkins's name or not, but Randall asked to speak to T.M. Perkins kept asking T.M. who was on the phone, but she did not answer him. T.M. and Perkins left the apartment about 10 or 15 minutes after T.M. got off the phone.

About five minutes later, K.S. heard popping sounds, which she thought was her son popping his balloons upstairs. T.M. ran back inside, saying "Call 9-1-1" and that Perkins had been shot.

At some point after Perkins's murder, K.S. learned that T.M. was at a motel with Randall and expressed her disbelief to another friend that T.M. would take up with

---

[6] Throughout this opinion, and consistent with the usage of the parties at trial and on appeal, we use the term "n-word" when referring to the racial slur that S.M. and other witnesses used at trial and further employ dashes when quoting that word from their testimony. (See *People v. Ware* (2022) 14 Cal.5th 151, 159, fn. 1.)

Randall. That same night, Randall called K.S. and told her, "[k]eep my name out of your mouth or I will fuck you up." K.S. was scared and took Randall's threat seriously.

### iv. J.P.'s testimony

J.P., Perkins's sister, testified that she lived in an apartment in Seaside in 1995, just a few minutes from where Perkins lived with their mother. On the evening of his murder, Perkins stopped by to see J.P. and he tried to give her a brown paper bag full of money. J.P. did not take the money from Perkins.

### v. Initial police investigation

Seaside police were dispatched to the shooting at 10:53 p.m. on September 21, 1995. When they arrived, officers found Perkins lying on a path, with his T-shirt and jacket pulled up over his head. Officers found a single .380-caliber bullet casing in the area. Perkins had been shot twice, once in the head and once in the upper left side of his chest, and two .380-caliber bullets were recovered from his body during the autopsy. Police did not find the paper bag full of money, which J.P. said Perkins had tried to give her earlier that night.

Detective Barry Pasquarosa was one of two detectives assigned to investigate Perkins's murder. Pasquarosa learned that Perkins had been driving a white 1984 Crown Victoria that night, and officers found that vehicle parked near K.S.'s apartment. The hood of the vehicle was partially open, and the engine had been tampered with so that it would not start.

Detective Christopher Veloz was the second detective assigned to the Perkins's murder investigation. Veloz conducted a recorded interview of T.M. at the police station the day after the murder. Veloz wanted to interview Randall as well, so he put out a "be-on-the-lookout" notice for him to other police agencies. Despite that notice, Veloz never located Randall or spoke to him about the murder.

### vi. V.R.'s testimony

V.R. testified that Randall spent the night at her home the night before Perkins's murder. She denied ever speaking to any police officers after the murder in 1995 and, when part of a 1995 recorded conversation with a police detective was played at trial, V.R. denied that it was her voice that could be heard on that recording. V.R. said that she had a strict policy of never speaking to police without being subpoenaed. V.R denied ever telling police she overheard Randall speaking to someone on the phone for 20 minutes the night of the murder or that she heard him tell the other person on that call, "[t]hat's messed up what you did to me [] and I am going to handle it."

The recording of the police interview with V.R. was played in court. In that interview, V.R. told police that Randall was at her house on the night of the murder, and she overheard him talking on the phone for 20 minutes with K.S. and another person. V.R. said she heard Randall tell that other person, " 'That was messed up what you did to me, man,' [¶] '[a]nd I'm gonna handle it.' " In that interview, V.R. also said that Randall left her home around 9:30 p.m. on the night of the murder.

### vii. 2005 investigation

Judy Veloz testified that she was employed as a detective in the Seaside Police Department in 2005 at which time she reopened the investigation into Perkins's murder. As part of that investigation, Veloz reinterviewed T.M. who, for the first time, disclosed the incident a week before Perkins's murder where Randall tried to rob Perkins at gunpoint. T.M. told Veloz that one of her cousins was present during that attempted robbery but did not give Veloz the name of that cousin. Throughout the interview, T.M. appeared reluctant to talk to Veloz and "seemed nervous."

### viii. 2021 investigation

In 2021, Seaside Police Detective Joshua Parker took an interest in Perkins's cold case murder and decided to pursue it. Parker interviewed T.M. in February 2021. During

7

his interview with T.M., Parker learned that T.M.'s cousin, S.M., witnessed the incident where Randall threatened Perkins with a gun and tried to rob him.

On January 19, 2022, Parker conducted a telephone interview with J.I. who told him that, the day after Perkins's murder, she was at her drug dealer/boyfriend's house and overheard Randall brag about robbing and murdering Perkins. In a subsequent in-person interview that same day, J.I. again told Parker she heard Randall "talkin' about [] how he robbed this n[---]a and went all up in his pants and his balls and took his money. Then, he shot and killed that n[---]a."[7]

### ix. Testimony about Randall's bloody shirt

N.C. testified that she was talking on the phone with her husband's cousin late in the evening on September 21, 1995, when Randall knocked on her door. He had fresh blood on his clothing and asked N.C. if he could use her bathroom. Randall was acting "[p]aranoid[] [and] panicky." N.C. did not notice that Randall was injured in any way.

N.C. asked Randall why he needed the bathroom and why he had blood on his clothes, but he ignored her and again asked to use the bathroom. N.C. allowed him to do

---

[7] Recordings of J.I.'s interviews were played for the jury. At trial, J.I. was less cooperative. She testified she did not know if Randall was actually at her drug dealer/boyfriend's house after the murder, she did not hear Randall make any statements about Perkins's murder, and that it was her drug dealer/boyfriend who told her that Randall had made those statements. J.I. then testified that she heard "other people in the room talking about how they went in his [i.e., Perkins's] pocket and went up his genitals and took the money, but I wasn't for sure it was [] Randall." When asked if she had told Parker that Randall had made those statements, J.I. said, "I don't remember. I probably was high then." J.I. admitted that, after she was subpoenaed to testify, she called the district attorney and left him a voicemail saying she would not appear. In that voicemail, J.I. explained that her refusal to testify was "because … people are callin' me a snitch and they're threatening my family." In a previous voicemail, J.I. said that she did not want to testify and that she "was on drugs at that time." Both of J.I.'s voicemails were played for the jury.

so. Her husband's cousin, who was still on the phone, told N.C., "Make sure you get them n[---]as out your house because they killed my friend."

When Randall came out of the bathroom, N.C. saw that he was wearing a different, clean shirt and was carrying a white shopping bag "with a little handle on it." He had left his bloody shirt on her bathroom floor. Randall did not say anything to N.C. but walked out the door and got into a car that was waiting for him on the corner. N.C. was "scared, [and] crying" because Randall's bloody shirt was on her bathroom floor, and she knew that Perkins had been killed.

At some point after Randall left, N.C.'s sister, S.C., arrived. S.C. calmed N.C. down and said she would help her. S.C. took the bloody shirt and burned it in N.C.'s fireplace.

S.C. testified that, after N.C. told her about Randall leaving his bloody shirt in the bathroom, she "panicked." S.C. told N.C. that if that was the shirt Randall was wearing when he killed Perkins, N.C. "could lose her [government-assisted housing], and they could take her kids away [from her]." Without "realizing" what she was doing, S.C. took the clothes and burned them.

### x. Testimony about Randall's incriminating statements

A.C. (no relation to S.C. or N.C.) testified that she lived with and dated Randall in 2013. On November 9, 2013, Randall came into the bathroom and asked A.C. whether she was cheating on him and who the "other guy" was. Randall told A.C. that he would get a gun and "use it on [her]." Randall told A.C. that he had "killed over a bitch [before]." A.C. asked Randall if he was serious and, in an angry tone, he said "he put that on his momma."

Randall's wife, J.R., testified that she had known Randall for about 13 years though they were currently estranged. In 2002 or 2003, J.R. asked Randall if he killed Perkins and Randall replied, "[T.M.] knows."

9

Following Randall's arrest in 2021, Seaside police placed an undercover informant in the same jail cell with him. The informant was wearing a recording device. A second recording device was secreted inside the cell and a third was hidden inside a smoke detector just outside the cell. Before placing Randall with the informant, police told Randall that he had been arrested for Perkins's murder and also told him that they had found his DNA on Perkins's shirt.[8] The undercover informant asked Randall what "was that DNA shit about []?" Randall replied, "My DNA was on the shirt" and later clarified that it was "[b]lood" on the shirt.

F.M. testified pursuant to a cooperation agreement following his 2021 arrest for a residential burglary. While in jail, F.M. met Randall and they became friends. Over time, Randall started to confide in F.M. about Perkins's murder. F.M. asked Randall why he was in jail, and Randall gave him a "weird look." Randall then said that he had "fucked up" and he "should have thrown the bloody shirt out the window." In subsequent conversations, Randall told F.M. that he had "shot somebody" but he would not be in custody if K.C. and another person, G.H.,[9] had not "told on him." Randall said that after the murder, "he went to [K.C.'s] house … took [his] shirt off and [] told them to get rid of it, and they burned it in the fireplace."

F.M. asked Randall what kind of gun he used, and Randall "said a .38." F.M. also asked who he had killed, and Randall said Perkins. Randall said that he killed Perkins "over drugs." F.M. said that Randall told him he had robbed Perkins about a week before the murder, but that Perkins did not have anything. F.M. said that Randall "seemed

<hr>

[8] The police had not recovered Randall's DNA from Perkins's shirt but lied to him in an attempt to get him to make incriminating statements to the informant.

[9] Randall had a copy of the preliminary hearing transcript in the jail. Although G.H. did provide information about Perkins's murder to the police, he did not testify at the preliminary hearing nor was there any mention in that transcript that G.H. had spoken to police about the case.

pissed off" that he did not get anything from Perkins. When describing the murder, Randall said, "I finally got this mother fucker" and that he "snatched [Perkins] up."

Randall also told F.M. that the prosecution's case against him was weak because they did not have the murder weapon and his bloody shirt had been burnt. Randall was "pissed" that K.C. testified at the preliminary hearing and told F.M. when he got out of jail, he would "get her." F.M. understood that Randall meant that he would kill K.C. Randall told F.M. that one of the witnesses who testified against him at the preliminary hearing had died from a stroke[10] and that was "good for his case."

### 2. Defense case

Monterey County Sheriff's deputy Jorge Herrera Ponce testified that he worked as a classification officer at the county jail. Ponce assisted in removing Randall from his dormitory after Randall stole another inmate's property as that inmate was being assaulted by other inmates. During that removal, Ponce discovered that Randall was in possession of legal documents from his case,[11] so Ponce took those from the dormitory and put them with Randall's personal property in a secure location.

## II. DISCUSSION

Randall argues that the trial court erred in admitting S.M.'s testimony that he attempted to rob Perkins a few days before the murder, on the basis the evidence did not allow the jury to draw a legitimate inference of either intent or motive as required under Evidence Code section 1101, subdivision (b). Randall also contends that admitting this evidence was error under Evidence Code section 352 because its probative value was outweighed by its prejudicial impact. For the reasons explained below, we disagree.

---

[10] T.M. had a stroke and died after the preliminary hearing.

[11] In final argument, defense counsel suggested that F.M. learned the details about the murder from these documents, not from Randall.

11

### A. Additional background

Before trial, the prosecutor brought an in limine motion to introduce evidence, under Evidence Code section 1101, subdivision (b), of the attempted armed robbery of Perkins several days prior to the murder in order to prove motive and intent.[12] Defense counsel objected.

The trial court subsequently granted the prosecutor's motion to admit evidence of the prior attempted robbery of Perkins and the assault on T.M., as well as the statement Randall made which "purported to question [T.M.'s] judgment in choosing" Perkins, for the purposes of showing Randall's motive and intent in murdering Perkins. The court also noted that the prior incident "supports the contention that [] Randall harbored the same intent on the date of the murder, since, in both instances, [] Randall showed up, unexpectedly, at a place where he knew [T.M.] and [] Perkins would be together. In both instances, [] Randall was armed with a firearm, and in both instances property was either taken, or [] Randall attempted to take the property belonging to [] Perkins by force."

After the close of evidence, the trial court instructed the jury that, if it decided that Randall committed the prior attempted robbery of Perkins and assault on T.M., it could "consider that evidence for the limited purpose of deciding whether [Randall] acted with the intent" or had the motive to kill Perkins under one of the three theories of first degree murder presented in this case, i.e., willful, deliberate, and premeditated murder, murder by lying in wait, and murder committed while committing or attempting to commit robbery. The court then instructed the jury on the different requirements which pertain to each of those theories of first degree murder. As to the theory of first degree felony murder, the trial court instructed the jury that "[t]o prove that the defendant is guilty of

---

[12] The prosecution also sought to introduce additional prior acts of domestic violence by Randall under Evidence Code section 1109, but the trial court excluded all of that evidence as unduly prejudicial.

12

first degree murder under this theory, the People must prove that the defendant committed or intended to commit a robbery, and while committing or attempting to commit a robbery, the defendant caused the death of another person."

### B. Legal principles and standard of review

Evidence Code section 1101 governs admission of prior act evidence. "(a) Except as provided in this section …, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, …) other than his or her disposition to commit such an act." (Evid. Code, § 1101.)

" 'Evidence of uncharged crimes is admissible to prove … intent "only if the charged and uncharged crimes are sufficiently similar to support a rational inference" on these issues.' (*People v. Edwards* (2013) 57 Cal.4th 658, 711 [161 Cal.Rptr.3d 191, 306 P.3d 1049] (*Edwards*).) The degree of similarity varies depending on the purpose for which the evidence is offered. 'The least degree of similarity … is required in order to prove intent.' ([*People v.*] *Ewoldt* [(1994)] 7 Cal.4th [380,] 402.) For this purpose, 'the uncharged misconduct must be sufficiently similar to support the inference that the defendant " 'probably harbor[ed] the same intent in each instance.' " ' (*Ibid.*)" (*People v. Chhoun* (2021) 11 Cal.5th 1, 25 (*Chhoun*).)

However, because of the "highly inflammatory" and potentially prejudicial impact of uncharged misconduct evidence, the Supreme Court has long admonished that " ' "its admissibility should be scrutinized with great care." ' " (*People v. Cage* (2015) 62 Cal.4th 256, 273; see also *People v. Ewoldt*, *supra*, 7 Cal.4th at p. 404 (*Ewoldt*)

13

["Evidence of uncharged offenses 'is so prejudicial that its admission requires extremely careful analysis. [Citations.]' [Citations.]"]; *People v. Thompson* (1980) 27 Cal.3d 303, 314 ["This court has repeatedly warned that the admissibility of this type of evidence must be 'scrutinized with great care.' [Fn. omitted.]"].)

Moreover, "[e]ven if evidence of the uncharged conduct is sufficiently similar to the charged crimes to be relevant for a nonpropensity purpose, the trial court must next determine whether the evidence's probative value is 'substantially outweighed by the probability that its admission [would] … create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352; see *Ewoldt*, *supra*, 7 Cal.4th at p. 404.)" (*Chhoun*, *supra*, 11 Cal.5th at p. 26.) "Because substantial prejudice is inherent in the case of uncharged offenses, such evidence is admissible only if it has substantial probative value. [Citation.]" (*People v. Kelly* (2007) 42 Cal.4th 763, 783.)

"Prejudice under Evidence Code section 352 refers to ' " 'evidence which uniquely tends to evoke an emotional bias against [the] defendant as an individual and which has very little effect on the issues.' " ' (*People v. Williams* (2013) 58 Cal.4th 197, 270 [165 Cal.Rptr.3d 717, 315 P.3d 1].) In this context, ' " ' "prejudicial" is not synonymous with "damaging." ' " ' (*People v. Virgil* (2011) 51 Cal.4th 1210, 1249 [126 Cal.Rptr.3d 465, 253 P.3d 553].) ' "Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of undue prejudice. Unless the dangers of undue prejudice, confusion, or time consumption ' "substantially outweigh" ' the probative value of relevant evidence, a section 352 objection should fail." ' (*People v. Doolin* (2009) 45 Cal.4th 390, 438–439 [87 Cal.Rptr.3d 209, 198 P.3d 11].)" (*People v. Thomas* (2023) 14 Cal.5th 327, 363 (*Thomas*).)

14

We review the trial court's admission of evidence under Evidence Code sections 1101 and 352 for abuse of discretion. (*People v. Fuiava* (2012) 53 Cal.4th 622, 667–668.) " ' "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal … is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' [Citation.]" ' (*People v. Foster* (2010) 50 Cal.4th 1301, 1328–1329 [117 Cal.Rptr.3d 658, 242 P.3d 105] (*Foster*).)" (*Chhoun*, *supra*, 11 Cal.5th at p. 26.)

### C. Analysis

#### 1. The evidence was admissible under Evidence Code section 1101.

Randall argues that the trial court erred in admitting evidence of the attempted armed robbery of Perkins. As to the issue of intent, Randall argues the prior uncharged act shared no similarity with the result of the charged offense, i.e., the actual murder of Perkins. The attempted robbery took place in daylight, in the presence of others, whereas the murder took place at night, on a darkened walkway with only one other bystander/witness, T.M. We are not persuaded.

In this case, Randall was charged with first degree felony murder with robbery as the underlying felony and the jury was instructed accordingly. We conclude the prior incident of attempted robbery was relevant and sufficiently similar in nature to the charged offense of felony murder "to support the inference that the defendant probably harbor[ed] the same intent in each instance." (*Ewoldt*, *supra*, 7 Cal.4th at p. 402.)

Here, the prior attempted robbery had substantial probative value. In their testimony, S.M. and T.M. described how Randall came into the bedroom, armed with a handgun, and demanded that Perkins give him a paper bag filled with money. When Perkins refused, Randall violently assaulted T.M., exclaiming his disbelief that she had chosen Perkins over him. A few days later, while T.M. and Perkins were again together and shortly after Perkins had been seen with a bag of cash, Perkins was grabbed, robbed,

15

and shot to death.[13] In both instances, a firearm was used, Perkins was in T.M.'s company, and Perkins was believed to be carrying a bag full of money, and thus the evidence of the prior attempted robbery was sufficiently similar to demonstrate that Randall had the same intent, i.e., to rob Perkins, on both occasions.

Randall also argues that the district attorney failed to show any "motive nexus between the attempted robbery … and Perkins's murder." We disagree.

" 'When reviewing the admission of other crimes evidence to show motive, " 'a court must consider: (1) the materiality of the fact to be proved or disproved, (2) the probative value of the other crime evidence to prove or disprove the fact, and (3) the existence of any rule or policy requiring exclusion even if the evidence is relevant.' " ' [Citation.]" (*Thomas, supra,* 14 Cal.5th at p. 358.) Unlike intent, "the probativeness of other-crimes evidence on the issue of motive does not necessarily depend on similarities between the charged and uncharged crimes, so long as the offenses have a direct logical nexus. [Citations.]" (*People v. Demetrulias* (2006) 39 Cal. 4th 1, 15.) The evidence of the prior attempted robbery demonstrated how Randall reacted with anger and violence upon encountering T.M. and Perkins together in her bedroom, especially once Perkins refused to give up the bag of cash. Randall then turned that anger on to T.M., pistol-whipping her and pulling out her hair, while yelling at her asking how she could have chosen Perkins over him.

On the night of the murder, Randall called K.S.'s home and learned that T.M. and Perkins were there together. During this phone conversation, V.R. reported that she overheard Randall, who she said was speaking to either K.S. or T.M., " 'That was messed

---

[13] Although neither T.M. nor K.S. said anything about Perkins carrying a bag of cash the night of his murder, J.P. testified that Perkins did have such a bag that night. J.I. also told police, both over the telephone and during an in-person interview, that she overheard Randall bragging that he robbed and killed Perkins.

up what you did to me, man,' [¶] 'and I'm gonna handle it.' " When T.M. confirmed that she would not "fuck with" him anymore, Randall hung up. On both occasions, there was evidence that Perkins was carrying a bag full of money. The court did not err in admitting this evidence since a jury could have reasonably inferred that Randall was motivated to kill Perkins that night due to his jealousy, as well as his ongoing desire to take Perkins's money, and that there was a direct logical nexus between the two events.

### 2. No abuse of discretion under Evidence Code section 352

Randall also argues the trial court should have excluded the evidence of the prior incident because its prejudicial impact far outweighed its probative value.[14] As explained below, we conclude that the trial court did not abuse its discretion in admitting the evidence.

Considering that the jury was instructed on a theory of felony murder based on robbery, the prior act evidence of Randall's attempted armed robbery had significant probative value in explaining his motive and intent to commit the robbery and murder Perkins. Furthermore, the evidence of the prior incident was not so inflammatory that "its probative value [was] substantially outweighed by the probability that its admission [would] (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) In the prior incident, after Perkins refused to give Randall the money, Randall violently assaulted T.M., apparently as punishment for choosing Perkins over himself. T.M.'s injuries, as described by S.M. consisted of bruising and a bleeding scalp. In the murder,

---

[14] In his reply brief, Randall argues for the first time that the trial court "should have … limited [the prior incident evidence] in a way to avoid the inflammatory impact of the account of [his] violence against [T.M.]" Randall did not raise this argument in his opening brief and made no showing of good cause for failing to raise it earlier. "As a general proposition, points raised for the first time in a reply brief will not be considered unless good reason is shown for failure to present them earlier. [Citations.]" (*People v. Whitney* (2005) 129 Cal.App.4th 1287, 1298.)

someone—presumably the killer[15]—first disabled Perkins's vehicle, then waited for him to come out to the darkened walkway before grabbing him and shooting him in the head and chest.  While the prior incident certainly involved more outward rage and emotion than the planned robbery and execution of Perkins, the attempted robbery would not have so inflamed a jury that it would have been incapable of making a reasoned judgment on the evidence presented.

Furthermore, the jury was instructed that it could only consider the evidence of the prior attempted robbery for the limited purpose of Randall's motive and intent, that it should not consider the evidence "for any other purpose," and it should "not conclude from this evidence that [Randall] has a bad character or is disposed to commit a crime."

We decide on this record that Randall has not met his burden to prove the trial court abused its discretion in admitting the prior incident.

### 3. No prejudice

Even if we were to assume that the trial court erred in admitting the evidence of the prior attempted armed robbery, Randall cannot show that he was prejudiced thereby. To show reversible error under state law, Randall must show a reasonable probability of obtaining a more favorable result at trial if the evidence had been excluded.  (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*).)  Randall also asserts that the error deprived him of a fair trial and thus we should examine prejudice under the stricter federal standard set forth in *Chapman v. California* (1967) 386 U.S. 18 in which the burden would be on the Attorney General to show the error was harmless beyond a reasonable doubt.  We do not find any violation of the U.S. Constitution, and thus we apply *Watson*. (*People v. Partida* (2005) 37 Cal.4th 428, 439 ["Absent fundamental unfairness, state law

---

[15] Although latent fingerprints were recovered from the distributor cap of Perkins's vehicle in 1995, there is no record that those prints were ever examined.  The record indicates that those prints have subsequently been lost.

error in admitting evidence is subject to the traditional *Watson* test"].) Under *Watson*, the burden falls on Randall to show a reasonable probability that, absent the error, he would have achieved a more favorable result at trial. (*Watson, supra*, at p. 836.) Given the weight of the other evidence establishing Randall's culpability,[16] as discussed below, no such reasonable probability has been shown.

On the night of the murder, Randall appeared at K.C.'s home in a shirt covered with someone else's blood. K.C. testified that Randall was "panicky" and used her bathroom to change his shirt. The following day, J.I. overheard Randall brag to his friends that he robbed Perkins, and then shot and killed him.[17]

In 2021, following his arrest, Randall admitted shooting and killing Perkins to F.M. and also admitted that he never should have involved K.C. in disposing of the bloody shirt. Randall also admitted to F.M. that he killed Perkins with a .38-caliber gun but that the police had never located the murder weapon.

In addition, J.R., Randall's then-wife, testified that she asked Randall in 2002 if he had killed Perkins. Randall did not deny having done so, but only responded, "[T.M.] knows." Given that T.M. was the only other person who might have seen Randall the

---

[16] As Randall notes in his opening brief, "the case was about the identity of the shooter and whether [he] was involved in the homicide at all …."

[17] Randall argues that J.I. was not a credible witness as she was a "heavy drug user" who changed her testimony several times. However, J.I.'s voicemails to the district attorney, which were played for the jury, demonstrate that she was afraid to testify at the trial because "people are callin' [her] a snitch and they're threatening [her] family." The jury could have reasonably believed that J.I.'s vacillations were motivated by fear, not drug use or because she was untruthful. "It is well settled that the jury has wide latitude to believe or disbelieve witnesses, or even specific portions of their testimony, as it sees fit. ' "[T]he jury properly may reject part of the testimony of a witness, though not directly contradicted, and combine the accepted portions with bits of testimony or inferences from the testimony of other witnesses thus weaving a cloth of truth out of selected available material." ' [Citations.]" (*In re Lopez* (2023) 14 Cal.5th 562, 591.)

night of the murder, his response implies that T.M. might have knowledge of his guilt. Randall also told his then-girlfriend, A.C., in 2013, that he had previously killed someone over a woman.

Finally, when arrested, the police told Randall his DNA was on Perkins's shirt and Randall believed that was true. Rather than questioning how his DNA could have been on Perkins's shirt, Randall appeared to have accepted that this was so, telling the confidential informant placed in his cell that, "My DNA was on the shirt."

In light of the overwhelming evidence of Randall's guilt, any error in the admission of the prior attempted armed robbery was not prejudicial. (*Watson, supra*, 46 Cal.2d at p. 836.)

### III.    DISPOSITION

The judgment is affirmed.

_____

WILSON, J.

WE CONCUR:

_____

LIE, Acting P. J.

_____

BROMBERG, J.

*People v. Randall*
H050165